## WALTER G. TRACY v. POMEROY BROTHERS.

### ERROR TO THE COURT OF COMMON PLEAS OF BRADFORD COUNTY.

Argued March 15, 1888—Decided April 16, 1888.

Plaintiffs were holders of a note with two indorsers, protected by collaterals furnished by the first indorser, when defendant bound himself by a separate obligation to pay them any sum, not exceeding a certain amount, they might fail to collect on the note or from the collaterals : *Held*,

1. That defendant's undertaking was a new and independent responsibility assumed with a knowledge of the antecedent and at least equal equities of the indorsers, and he had no claim upon the collaterals either by subrogation or otherwise.

2. That his liability upon his obligation was fixed upon proof of the fact, which was for the jury, that plaintiffs had proceeded upon their note and the collaterals with due diligence and had failed to collect the full amount of the note.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY J., absent.

No. 38 July Term 1887, Sup. Ct.; court below, No. 413 December Term 1884, C. P.

On October 24, 1884, a summons in debt was issued by Horace Pomeroy and S. W. Pomeroy, doing business as Pomeroy Brothers, against Walter G. Tracy.

At the trial on March 28, 1887, it was made to appear that the Towanda Eureka Mower Co. was indebted to Pomeroy Brothers on a note dated January 3, 1877, for $5,000, drawn payable to the order of O. D. Bartlett and indorsed by O. D. Bartlett and John F. Means. On January 6, 1877, O. D. Bartlett assigned to Pomeroy Brothers $5,000 of a certain judgment of $10,000 which he held against John S. and S. D. Madden, as collateral security for the payment of said note.

On April 16, 1877, Walter G. Tracy executed and delivered to Pomeroy Brothers the following paper :

Whereas, Pomeroy Brothers are the holders of a certain promissory note, made by the Towanda Eureka Mower Company,

to the order of O. D. Bartlett, at 90 days, for the sum of $5,000, and indorsed by the said O. D. Bartlett, which note was dated January 3, 1877; and whereas said Pomeroy Brothers hold the assignment of a portion of a judgment against J. S. and S. D. Madden, as collateral security to said note; and whereas said Pomeroy Brothers desire further security on said note, now, in consideration of said request, and the sum of $1.00 to me in hand paid, the receipt whereof is hereby acknowledged, I hereby promise to pay to said Pomeroy Brothers any sum which they may fail to collect on said note, or from said collateral, not exceeding, in the whole deficiency which I am to make up, the sum of $500 with interest from this date. Witness my hand and seal the 16th day of April A. D., 1877. W. G. TRACY. [Seal.]

It also appeared that on July 8, 1879, John F. Means, the second indorser on said note, being also indebted on a like note to one R. O. Smith, in consideration of a release from further liability upon said two notes, gave to Pomeroy Brothers and Smith a bond and mortgage secured upon about 40 acres of land in Towanda township worth $1,750 or $1,800, conditioned for the payment of any balance upon said two notes not collected from said O. D. Bartlett and the Towanda Eureka Mower Company within two years from date.

Judgments were obtained by Pomeroy Brothers upon the note for $5,000 against the Towanda Eureka Mower Company and O. D. Bartlett, but, though pressed to insolvency all that could be realized from these defendants was the sum of $298.

In 1882, Pomeroy Brothers issued execution upon the judgment assigned to them against John S. and S. D. Madden, levied upon and sold for $100 certain real estate as the property of the defendants, and, after a rule to set aside the sale at the instance of Mrs. J. S. Madden, claiming title, was discharged, they received the sheriff's deed for said real estate. They then brought ejectment against Mrs. J. S. Madden and her husband, to recover possession of the land purchased. When the suit came on for trial before arbitrators it was settled, and, by an agreement in writing filed, the award was in favor of Mrs. Madden for the land, she and her husband executing a mortgage to Pomeroys for $3,250, afterwards paid to them, when they assigned to Mrs. Madden their interest in the judg-

ment against J. S. and S. D. Madden, formerly assigned to them as collateral security.

In 1883, upon a judgment obtained upon the bond and mortgage given by John F. Means to Pomeroy Brothers and R. O. Smith, the land bound thereby was sold at sheriff's sale and purchased by the mortgagees for $50, the interest of Pomeroy Brothers in the purchase being five twelfths, testified to be worth about $750.

The court, MORROW P. J., after referring to the foregoing facts charged the jury :

[Mr. S. W. Pomeroy testifies that this $3,250 is all that they ever obtained upon this Madden judgment ; that that settlement was as good as could be made, and that he considered the Madden judgment, on account of Mrs. Madden's claim to this land perfectly worthless.] [7] At the time of making this settlement with Mrs. Madden, and as a part of the consideration therefor, Pomeroy Brothers assigned to her their interest in this judgment against J. S. and S. D. Madden, which had formerly been assigned to them by O. D. Bartlett as collateral security.

Pomeroy Brothers also obtained from John F. Means, who was a subsequent indorser to Bartlett on the note of January 3, 1877, a bond and mortgage for $10,000 on 40 acres of land lying in the township and borough of Towanda. Judgment was afterwards obtained on this mortgage, and this 40 acres of land was sold and bid off for $50 by the Pomeroys and R. O. Smith. [Mr. Pomeroy testifies that they own five twelfths of that land, and that R. O. Smith owns seven twelfths, and that he considers the five twelfths owned by the Pomeroys worth about $700 or $800. Whatever this value is, the Pomeroys are bound to apply it on this indebtedness against the Eureka Mower Company. If you put the value of their share of this land at $750, then the Pomeroys have received, according to their own statement, upon this indebtedness, $298 from the sale of the Eureka Mower Company's property, $750 from this John F. Means mortgage, and $3,250 from the Madden settlement, making in all about $4,298 which they have realized upon this loan of $5,000 made to the Towanda Eureka Mower Company in 1877. Adding interest to this $5,000 since 1877, and taking

from the amount the different sums which the plaintiffs admit to have been paid, there would still remain due and unpaid at this date something like $2,000, or much more than the amount of the paper in suit.][8] And the defendant has offered no evidence to contradict the statements of Mr. S. W. Pomeroy as to the different sums which they have received. They claim that the $5,000 note not having been paid within $500 or more, they are entitled to a verdict upon this agreement of Mr. Tracy's for $500 with interest from its date.

The defence to this claim is that Walter G. Tracy, not having had any interest in this thing, and having voluntarily given this writing in suit, stands as a surety to O. D. Bartlett; that he stands in the same relation to the Pomeroys that O. D. Bartlett did; that he is entitled to a re-assignment of the Madden judgment which Bartlett assigned to the Pomeroys as collateral security, and that therefore by the Pomeroys assigning this collateral to Mrs. Madden, W. G. Tracy is released and discharged from his obligation upon this paper, and that the plaintiffs cannot recover. [Upon this subject we say to you that if the settlement made by the Pomeroys with the Maddens was fair and honest and in good faith; if they got the full and fair value of this collateral and applied it upon their indebtedness, then the defendant would not be released by their action, and they may recover, providing they have not already received their pay. If, however, this settlement was not fair and honest and in good faith; if they did not obtain the full value of their collateral, and W. G. Tracy had been damaged thereby, then he would be entitled to have all such damage deducted from the plantiff's claim in this case.][9] You have heard the evidence in this case as to the insolvency of the Towanda Eureka Mower Company, and of O. D. Bartlett and the claim of Mrs. Madden to this land, and [it is for you to say whether, under all the circumstances, the action of the Pomeroys has been in good faith, and for the best interests of all concerned in making the arrangements and settlements which have been shown by the evidence. The defendant has offered no evidence tending to show that the Madden judgment was of any value whatever.][10] The defendant's counsel has submitted certain points in writing, requesting us to charge you as follows:

1. The assignment by Pomeroy Brothers to Elizabeth Mad-

den of their interest in the judgment against J. S. and S. D. Madden, which had been assigned to them by O. D. Bartlett as collateral security for the note of the Towanda Eureka Mower Company, indorsed by said Bartlett and John F. Means, was a conversion of it to their own use, and they are chargeable with its full value.

Answer: This point is refused, under the evidence in this case.[3]

2. If the jury believe Pomeroy Brothers released their interest in the Madden judgment which they had obtained as security for their indebtedness against O. D. Bartlett, without the consent of Walter G. Tracy, who is the surety of the said Bartlett, said release operates as a discharge of said Tracy from all liability therefor, and therefore the plaintiffs cannot recover in this case.

Answer: Refused.[4]

3. The acceptance by the Pomeroy Brothers from John F. Means of his bond and mortgage dated July 8, 1879, given to them and R. O. Smith to secure the payment, inter alia, of the note of the said Towanda Eureka Mower Company, indorsed by said Bartlett and said Means, and the agreement contained in the said bond that the said Means was to be released from further liability upon said note, and the subsequent sale of the mortgaged premises upon said mortgage, satisfied said Pomeroy Brothers' indebtedness against said Means, and released Walter G. Tracy, the surety of said Bartlett.

Answer: Refused.[5]

4. If the jury believe Pomeroy Brothers released John F. Means from further liability upon said note of the said Towanda Eureka Mower Company, when they accepted his said bond and mortgage without the consent of Walter G. Tracy, said release operated as a discharge of said Tracy and the plaintiffs cannot recover.

Answer: Refused.[6]

The verdict of the jury was in favor of the plaintiffs for $797.50, and, judgment being entered thereon, the defendant took this writ assigning for error, inter alia:

3–6. The refusal to affirm the defendant's points.[3 to 6]

7–10. The parts of the charge embraced in [ ] [7 to 10]

*Mr. Rodney A. Mercur,* for the plaintiff in error.

The evidence is undisputed that the defendant had no knowledge of the assignment by the plaintiffs to Mrs. Madden of their interest in the judgment against John S. and S. D. Madden, nor of the release of John F. Means, the second indorser, when they, with R. O. Smith, received his bond and mortgage ; that he never gave his assent to either of these transactions nor ratified them in any way.

1. Pomeroy Brothers could not convert the collateral to their own use, even if it were necessary to do so to make the settlement with Mrs. Madden, without the consent of the defendant.   A holder of collateral cannot appropriate it in satisfaction of the debt at his own option, unless authorized to do so by the terms of the bailment.   After a default of the pledgor and notice of the intent to sell, and of the time and place, they undoubtedly would have the right to sell the collateral at a public sale : Munn v. McDonald, 10 W. 273; Diller v. Brubaker, 52 Pa. 498 ; Conyngham's App., 57 Pa. 474 ; 2 Am. & E. Encyc. of Law, 46 ; Davis v. Funk, 39 Pa. 243 ; Sitgreaves v. F. & M. Bank, 49 Pa. 359.   The plaintiffs did not perform one of these requirements, and ignored the rights of the defendant in the collateral.

2. Whether the settlement with Mrs. Madden was fair and honest and in good faith or not, and whether the amount received was a full and fair value for the collateral or not, are not controlling questions.   If the defendant was called upon to pay, the collateral belonged to him : Neff's App., 9 W. & S. 43 ; Templeton v. Shakley, 107 Pa. 380 ; Humphrey v. National Bank, 113 Pa. 417 ; Donnell v. Wycoff, 49 N. J. (L.) 48.   When the collaterals are placed in the hands of a creditor and they are lost by his negligence, the debt is extinguished : Lyon v. Huntingdon Bank, 12 S. & R. 67 ; Collingwood v. Irwin, 3 W. 306 ; Beale v. The Bank, 5 W. 529; Muirhead v. Kirkpatrick, 21 Pa. 237 ; Hanna v. Holton, 78 Pa. 334 ; McQueen's App., 104 Pa. 595 ; Spalding v. Bank, 9 Pa. 28 ; Bank of U. S. v. Peabody, 20 Pa. 454 ; Stuart v. Bigler, 98 Pa. 80.

3. The defendant bound himself to " pay any sum which they may fail to collect on said (the mower company's) note *or* from said collateral," etc.   Did they fail to collect from

Means? There is no evidence they even made the attempt. They settled with him and released him from further liability. If a creditor release a security which he has obtained for the whole debt, it will operate as a release or discharge of the surety from all liability as such: Neff's App., 9 W. & S. 43; Holt v. Bodey, 18 Pa. 212; Templeton v. Shakley, 107 Pa. 380; Tiers v. Blair, 3 Phila. 451.

*Mr. L. M. Hall* (with him *Mr. W. T. Davies* and *Mr. E. B. Parsons*), for the defendants in error:

1. The defendant's liability is by reason of an agreement in writing, under seal, to pay if the plaintiffs " failed to collect on said note." If then the plaintiffs made an honest and reasonable effort to collect their money on said note or from the collateral, the defendant is bound to pay. It is conceded they made such an effort as to the makers of the note, and that Bartlett was insolvent. As to the Madden collateral, plaintiffs showed its value, how and when it was disposed of, and accounted for its proceeds. The cases cited failed to justify the defendant's claim that they were bound to account for its face value.

2. Means was the last indorser upon the note of the mower company. A surety in the original obligation is entitled to subrogation as against a subsequent surety of the principal: McCormick v. Irwin, 35 Pa. 111; Burns v. Bank, 1 P. & W. 395; Pott v. Nathans, 1 W. & S. 155. Had Means been compelled to pay the whole of the original note perhaps he might have been entitled to subrogation against both Tracy and Bartlett, but in no event could Tracy resort to Means. Subrogation will not be decreed to the rights of a creditor who has not been fully satisfied: Kyner v. Kyner, 6 W. 221; Bank of Penn. v. Potius, 10 W. 148.

OPINION, MR. JUSTICE CLARK:

The principles of subrogation in equity have, in our opinion, no application whatever to this case; the only question is, whether or not the plaintiffs have proceeded upon the note and the collaterals with due diligence, and have in good faith applied the proceeds, and, having exercised such diligence, failed to collect the full amount of the note.

The Eureka Company were the principal debtors, and in equity and good conscience ought to pay the debt for which the bond in suit was taken as an additional security. Bartlett and Means were accommodation indorsers merely, and therefore sureties for the company ; and so was Tracy a surety, but his equity attached, subject to the prior equities of Bartlett and Means : he assumed a new and independent responsibility, with knowledge of their antecedent equities; he was a volunteer ; his undertaking was at the instance of Pomeroy Brothers, in order to better secure the debt owing to them.

If Tracy had paid the $500 in full satisfaction of Pomeroy Brothers' claim, he might perhaps have been subrogated to their rights as against the company. This would probably depend upon the special circumstances under which the obligation was assumed. But we cannot see upon what principle he could have been substituted to their rights, as against Bartlett and Means, whose equities were not only essentially equal to, but earlier than his. Nor is it entirely clear to our minds that Bartlett or Means, upon payment of the whole debt, would have had any such right as against Tracy ; for his liability, as we have said, was incurred, not at the instance of the company, the principal debtor, or for its advantage, or to the disadvantage or delay of the indorsers. The obligation in suit was an independent undertaking on the part of Tracy, which could do the company no good and the indorsers no harm.

It is a general doctrine of equity, that where a surety pays the debt of his principal, he may avail himself of the securities which the principal has placed in the creditor's power; "but," as Mr. Justice SERGEANT said in Pott *v.* Nathans, 1 W. & S. 155, "where such means consist of the responsibility of an individual, becoming a later surety or guaranty for the same debt of the principal, there arises a conflict of equities, which may give rise to new questions as to priority, between the former and the latter surety ; such latter surety, stipulating at the instance of the principal to pay the debt, suffers no absolute injustice in being obliged to do so, since he is compelled to perform no more than he undertook, and has no right to complain that he is not allowed to use, as a payment by himself, the money which proceeds from another person whom his principal was previously bound to save harmless. How the equity

would be, in a naked case of this kind, I give no opinion. It is sufficient that it is settled, that if the interposition of the second surety may have been the means of involving the first in the ultimate liability to pay, the equity of the first surety decidedly preponderates."

If Tracy had simply agreed, at the instance of Pomeroy Brothers, to become bound as an additional surety for the payment of this debt, to the amount of $500; if that were the "naked case" presented, we cannot see that Tracy would have any right to complain, if he was obliged to do just what he undertook to do; or that he was not allowed to use the Madden collateral, because that collateral did not belong to the company but to Bartlett, whom the company was previously bound to save harmless; and, if the interposition of Tracy was in no sense an advantage to the company, and could not be the means of involving the indorsers in the ultimate liability to pay, we cannot discover any equity which would arise, if the controversy were between the indorsers and Tracy, to impose the ultimate liability on him.

The nature and extent of the engagement into which Tracy entered is, therefore, to be ascertained from the terms of the writing in suit; the question of his liability must be determined upon the reasonable construction of the contract, by which his liability is attested. Tracy's obligation to pay was not an absolute one, it was qualified by certain conditions. He was bound to do just what he agreed to do, and no more. He promised "to pay to Pomeroy Brothers any sum which they might fail to collect on said note, or from said collaterals," not exceeding, in the whole deficiency which he was to "make up," the sum of $500, with interest, etc. The failure to collect, which was in the mind of the parties, was of course such as resulted from a reasonable effort in that behalf, and the question of fact for the jury was whether Pomeroy Brothers exercised reasonable diligence in the collection of the note and the collaterals. If they have done so, and have justly and in good faith applied the proceeds of the collection, at their true value, to the debt, they have done all they were required to do, in order to fix Tracy for the amount of his collateral obligation.

It is conceded that the Eureka Company was pursued to in-

solvency, and that no money could be made more than was made from that source; it is also conceded that the plaintiffs were not able to collect anything from Bartlett. It is of no consequence to Tracy that the collaterals were transferred to Mrs. Madden, if their value was exhausted; if Bartlett, to whom they belonged, consented to this, Tracy had no right to complain. Tracy had no claim to these collaterals by subrogation or otherwise; his right under his contract with Pomeroy Brothers was to have a reasonable effort made to collect them, and to have the proceeds of collection applied to this debt, at their actual or real value, and this according to the finding of the jury was done.

Means, it is conceded, was insolvent; he compromised with his creditors; Pomeroy Brothers and R. O. Smith, together, took a mortgage on forty acres of land worth $1,750 to $1,800; there is no evidence that anything better could have been done, or that any more of the claim could have been made out of him; indeed, it is not shown he had any other property. It is true, that upon the delivery of this mortgage, Pomeroy Brothers released Means from further liability on the note, but this was of no consequence to Tracy. Means was only a surety, and Tracy, as we have said, had no equity which would entitle him to stand in Pomeroy's place as against Means. The Pomeroys had taken the kernel out of Means's estate, and Tracy was not in position to demand that the empty shell must be turned over to him, before any liability would attach on his bond. The duty of Pomeroy Brothers was to use every reasonable effort to collect the note, and also the collaterals, and when they had done this, without realizing the full amount of their claim, their right of action against Tracy was complete. Pomeroy Brothers were not bound to await the mere possibility that Bartlett's collaterals might sometime become available, or that Means might rise above insolvency.

We are of opinion that the case was properly submitted to the jury, and—

The judgment is affirmed.